HOHORST v. HAMBURG-AMERICAN PACKET CO. et al.

(Circuit Court of Appeals, Second Circuit. January 5, 1899.)

No. 33.

PATENTS—INFRINGEMENT—ASCERTAINMENT OF PROFITS.
 Nominal damages only are recoverable where, although it appears that the defendant has infringed, and has derived some benefit therefrom, yet the evidence is so uncertain, and the knowledge of the witnesses so limited, that it is impossible to obtain any basis for calculating the amount of profits, other than mere haphazard speculation; and such rule is peculiarly applicable to a case in which it appears that defendant did not knowingly infringe, and that complainant had knowledge of the infringement for years, but neither gave the defendant notice of his claim, nor commenced suit, until immediately prior to the expiration of the patent.

Appeal from the Circuit Court of the United States for the Southern District of New York.

This was a suit in equity by Freidrich Hohorst against the Hamburg-American Packet Company and others for infringement of a patent. From a decree for complainant for nominal damages only (84 Fed. 354), he appeals.

This cause comes here upon appeal from a final decree of the circuit court, Southern district of New York, entered after an accounting, which decree sustained the master in awarding nominal damages and no profits. 84 Fed. 354. The suit was brought to restrain infringement of United States letters patent No. 119,765, to complainant, dated October 10, 1871, for improvement in slings for packages. Defendant answered, and by interlocutory decree, October 24, 1894, the validity of the patent was sustained, infringement found, and the cause sent to a master to ascertain the damages and profits, if any. On May 15, 1896, the master reported that: "While the defendant has received advantage from the use of the infringing device, there is no evidence from which it is possible to compute, or express in dollars and cents, the profits, gains, and advantages made by said defendant, or which have arisen or accrued to it from such infringement. The complainant is accordingly entitled

to recover nothing by way of profits, although entitled to nominal damages, and I fix and assess such damages at the sum of six cents." Upon this report coming before the circuit court (COXE, J.), the same was neither sustained nor reversed, but was returned to the master, with instructions to "follow the rule" laid down in Tuttle v. Claflin, 22 C. C. A. 138, 76 Fed. 227, and "take such further action in the matter as he may deem proper.". On April 26, 1897, the master filed a supplemental report, stating that, after full consideration, he saw no reason in any way to modify his former report. Thereafter, on December 23, 1897, the case came before the circuit court (TOWNSEND, J.) upon exceptions to the master's report. The court, after examination of the record, expressed the conclusion that it was "clear that the findings in the original report were justified by the evidence, and were in accordance with the general rule of law." It overruled the exceptions, sustained the report, and decreed accordingly. In the course of its opinion, the circuit court says: "The infringing devices were used in connection with other noninfringing devices according to the exigencies of the business of handling mixed classes of packages, constituting various kinds of cargoes of vessels, under constantly varying conditions. That the defendant derived an advantage from the use of the infringing device is expressly found, but the character of the testimony by which this fact was established was so conflicting and uncertain, and the knowledge of the witnesses was so limited in its scope, that it was manifestly impossible to obtain therefrom any basis of calculation from which to determine, with any degree of certainty, either the extent of the use of the infringing devices, or the saving effected, or profits derived from such use."

Charles M. Demond, for appellant.
Walter D. Edmonds, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts). In the opinion expressed in the excerpt above quoted, we entirely concur; and it will not be necessary to review in detail the several propositions covered in the master's report, nor to discuss the exceptions thereto seriatim.

Complainant, with a persistency wholly unwarranted by anything in the record, contends repeatedly in his brief that the defendant has been a willful and wanton infringer, that it has obstinately and perversely refused to file an account of profits when it was within its power to do so, and that, therefore, complainant's evidence, such as it is, is entitled to the most kindly consideration of the court. The bill of complaint contained the usual allegations as to infringement. It further averred that "said defendants have been warned and requested to desist and refrain from said infringement, and said unlawful and wrongful acts, but that said warning and request and notice have been wholly disregarded by them, and that said defendants still continue the infringements * * * as aforesaid." The suit was begun in September, 1888, 25 days before the expiration of the patent. The answer of the defendant company denies infringement, and further "denies that it has been warned and requested to desist and refrain from any pretended infringement of said letters patent." To sustain the affirmative of these issues, complainant called one Patrick Hughes, who was complainant's foreman from 1870 to 1890, and who manufactured all the slings that complainant sold. He testified that he saw rope slings in use on the steamers of defendant's company, "about the same as Mr. Hohorst's slings." He described them sufficiently to establish their infringing character. He further testified

that his visits to the defendant's docks were in complainant's interest, to discover whether they were infringing on his patent or not; that the last time he was there was prior to 1886; that from 1880 to 1886 he saw them using infringing slings over a dozen times; that he reported to Mr. Hohorst, but that he did not say a word to any one on the dock about using the infringing slings. No evidence whatever of any warning or request to desist from infringement prior to the beginning of the suit was offered. It appears that the infringing slings were four in number,—a number sufficient to equip a single gang of cargo handlers,—and as one wore out it would be replaced with a new one. They were made by one Loshi, an employé of defendant, out of old rope. They were used indiscriminately with other cargo-hoisting appliances, and sometimes freight would be going in and out of as many as eight gangways simultaneously. It is thus apparent that, so far from complainant having made out a case of willful infringement by defendant company, the converse is the fact. Fully aware as early as 1880, which is about a year after the infringing nets were made, that the defendant was using them, and kept advised from time to time by his foreman that infringement was continuing, complainant carefully refrained from saying or doing anything to warn defendant that it was infringing until almost the very day when the patent expired. The reason for this policy of inaction is quite apparent. A careful examination of the record will leave no doubt in any unprejudiced mind that, had complainant notified defendants at any time from 1880 to 1886 that the slings Loshi had made were infringements of his patent, the use of such slings would have ceased forthwith. They were convenient, and in some respects and under some conditions superior to other appliances; hence the set of four were always kept renewed. But manifestly they were not so superior as complainant contends, for their number was never increased. If they did not offer sufficient advantages to warrant increasing their number, it is difficult to believe that those advantages would have been sufficient to induce continued use after defendant was advised that they were infringements of a patent. The complainant has deliberately chosen not to warn an unconscious infringer, whom he has watched infringing year after year, no doubt hoping thereby to increase the amount of profits ultimately recoverable. This is sharp practice, and, if there ever was a case where complainant should be required to establish these profits by reliable and tangible proof, this is pre-eminently such. We further concur with the master in the conclusion that defendant was not in default for failing to file an account of profits from the use of the infringing articles. It is quite apparent that any pretended "account of profits" based on data in the possession of, or obtainable by, defendant, must have been the wildest guesswork.

The complainant further assumes that the patent sued upon is of the broadest scope. Thus, in the brief it is stated, "Any combination of side ropes with a net and with corner eyelets," or "any combination of self-adjusting straps with side ropes, corner eyelets, and a net for the purpose of loading or unloading packages," would be within the patent. The record lends no support to any such contention. There

91 F.—42

is no testimony whatever as to the state of the art, nothing at all bearing upon the construction and scope of the patent, except the patent itself, and the presumption of validity arising from its issue. The specification sets forth that the invention relates to a "sling made of rope netting, provided at its corners with eyelets through which pass protecting side ropes, which are fastened to the netting at its ends and sides, in combination with supporting straps or handles, the ends of which are provided with eyelets or grommets sliding on the protecting side ropes in such a manner that when the sling is loaded with a quantity of small packages, and suspended from its supporting straps, the protecting side ropes adjust themselves so as to prevent the packages from dropping out. * * * In the drawing, the letter A designates a netting made of nets of thick cords in an oblong or rectangular form. To each of the four corners of this rope netting is secured an eyelet or grommet, a, and through these grommets pass the protecting side ropes, b, which are fastened at their ends to the ends in the netting near the said grommets, and in the middle to the sides of the netting, as shown in Fig. 2 of the drawing," etc. By reference to the "side ropes, b," "substantially as described," the peculiarities of the side ropes pointed out in the specifications are imported into the claims. Certain it is that, according to the specification, the fastening of the side ropes at the ends, and again at the middle of the sides, of the net, is an essential feature of the patented combination. Why this was so, we can only conjecture, since complainant has given us no information as to the state of the art, but that it is so the specification abundantly shows; and we must assume that the patentee inserted this qualification because he was satisfied that it was necessary so to do. It follows that a net sling drawn together, as is a purse or reticule, by side ropes rove through rings or grommets surrounding the net, and which side ropes are not fastened either at the sides or the ends of the net, but play freely through the grommets, would not be within the claims of the patent.

The calculation by which complainant undertakes to show the amount of profits accruing to defendant from the use of the infringing articles is a complicated one, involving numerous factors. Of course, if any single factor is not sustained by competent proof, the conclusion sought to be maintained is not established. Complainant undertakes to show (1) what kinds of cargo were handled with the infringing slings; (2) what was the total amount of those kinds of cargo imported and exported while the infringing slings were in use; (3) what proportion of each kind of cargo was handled with the infringing slings; (4) how much faster the net sling of the patent would work than any other device which defendant was free to use; (5) how much of the time of a gang of workmen was thus saved by the use of the slings, assuming that they worked as much faster as the evidence under 4, ante, showed; (6) how many men there were in a gang; (7) how much per hour the men were paid. Assuming that there was satisfactory evidence giving some definite answer to each of these questions, a serious difficulty would yet remain, since the evidence shows that most of the workmen employed by defendant were hired and paid by the week; saving in their time would not necessarily mean a saving of

profit in dollars and cents. The master has indicated the various other appliances in use at the time by defendant,—principally the endless rope sling, and the "herring tub," so called,—and has carefully set forth his reasons for reaching the conclusion that the testimony relied upon to support the proposition that some specific proportion of the different kinds of cargo was handled with the net slings is "the merest conjecture and speculation, and cannot be used as a basis for such a computation as the law requires." It would expand this opinion to an undue length to review the evidence bearing on all of these propositions, and it will be quite sufficient to discuss that bearing on the fourth one, viz. relative rate of speed. All the testimony in the case was introduced by complainant, who first called. Badenhausen, the superintendent of defendant's piers. He testified that the net slings would not unload beer kegs any faster than the common rope slings; that the idea of using the net slings was because it is "safer for the men" (i. e. safer than rope slings), and "handier for the men." "Instead of lifting into the tub all day, it is easier just to set it in the net." The next witness was Loshi, defendant's tool-house keeper, who made the infringing nets. He explained that although the net sling was more easily loaded, since it was laid flat upon the deck, and small articles wheeled up on trucks and dumped into it, thus saving the time required to lift them into the tubs, the latter were more easily and quickly unloaded, being merely turned bottom up, and the load left on the deck while the tub was on its way back for a fresh load. The net sling had to lie on the deck till all its contents were picked out of it by hand. He testified that there was no gain of speed, as compared with the tubs, and that for larger articles the old rope sling was quicker, and that the nets were used, and their original number (four) kept up, because they were safer than the rope slings, and a little handier for the men than the tubs. The testimony of these witnesses is strongly corroborated by the circumstance that they did not increase the number of net slings. Evidently the slings were convenient to work with the other appliances, but they certainly, as worked on that dock, could not have demonstrated their capacity to do the work in a half to a third of the time (as complainant contends), or their number would have been promptly increased. The next witness, Behrens, was foreman stevedore on defendant's piers. He testified that with beer kegs he did quicker work with the rope slings, and used less men than with the nets, but that the latter are a little safer. Glasboff was a gangway man in the employ of defendant from 1869 to 1886, and was injured while in its employ, and evidently thinks he was not treated as liberally as he should have been. Duggan also worked for defendant while it used the infringing net slings, but neither of these witnesses was asked as to relative speed. The complainant then called Hansen. He was a foreman stevedore of the Red D Line, and, of course, knew nothing of the speed made with the particular infringements used by defendant. He testified that for ordinary small stuff the net sling was the fastest way of loading; that it was three times as fast with firkins of lard, and twice as fast with other kinds of small stuff. It appears, however, that the witness made his comparisons solely with the old rope sling and with the canvas

sling. He had seen the so-called "herring tubs," but never had them in use, and, of course, was not qualified to testify whether they were faster or slower than the net slings. Hughes, complainant's foreman, testified that the nets worked "as fast again as what was used before"; but he seems to make his comparison with a species of roped-in platform running on a traveler, and in use by the Cunard Line. He admitted that he had not seen herring tubs in use. Ryan was in the employ of the defendant as stevedore and assistant foreman from 1866 to 1888, when he was discharged for drunkenness. Comparing the net slings with the herring tubs, he said "the nets were the handiest working. Some faster. I couldn't say exactly how much. It would be more or less faster, anyhow. It couldn't be twice as fast; no. It would be some faster. I couldn't tell you how much. It would be no such thing as twice as fast, and nothing near it." Miller was foreman stevedore on the Rotterdam Dock, and knew nothing of the relative rates of speed which defendant made with its appliances. He testified that, "taking the nets, you can double the work that you can do with anything else,—in the same time, with the same men." This, of course, was an estimate. He never made any observations, nor "kept time on them," nor made any memorandum. Moreover, it appeared that he was comparing the nets only with a peculiar kind of tub used on the Rotterdam Dock,—a shallow platform, not the same sort of shape as defendant's herring tub, and in which little kegs had to be packed carefully, laying one on top of the other, head on head. Davie, a longshoreman, testified that he had worked for all the principal stevedores in New York. He said that, in his experience, the nets would just treble speed, compared with other ways of handling small stuff. This exact estimate would be more valuable, if the witness had indicated where he had worked, and what other appliances he had used, so that we might determine whether the comparison at all affected defendant's appliances. Incidentally, the witness stated that he had used three kinds of net slings, but no one asked him to differentiate them. Titcomb has been a stevedore, and is now a head stevedore with the Red D Line. He has used rope slings, box slings, and tubs. He finds that with "the net slings" he can "save half the time, take it right through." This is an estimate, for he never instituted any comparison, or kept any account, or timed the use of the sling at all. Moreover, it is doubtful whether "the net slings" he is speaking of are those of the patent. His description, under cross-examination, of the nets he used, is somewhat vague, but on redirect he seems to indicate that the side ropes in his slings were not fastened to the net in the middle. Hennings is a stevedore in business for himself, and has worked for various lines, including defendant's. Comparing the nets with the tubs, he says they work a good deal faster, and he can save half the time on them. He never timed the two methods with a watch. Meany, longshoreman, comparing "the net sling" with the tubs, testified that "it is about three times faster." He had used two different kinds of net sling, but is not asked to differentiate them. Probst, a stevedore now in business on his own account, testified that "the net sling" goes twice as quick, as compared with tubs or other

things; that one can "do the same kind of work in half the time." This estimate was the result of an actual experiment where witness had timed sling against tub. Upon cross-examination some light was thrown on the "different kinds" of sling, which earlier witnesses had referred to. The witness was no draftsman, and his sketch of the kind of net sling which he had used is not by itself altogether intelligible; but his evidence leaves no doubt that it was one in which the side ropes ran completely around the net, through thimbles or eyes, not being fastened either at the ends or at the sides of the net. This evidence is most important, as showing the existence of a net sling, apparently free to defendant, and certainly not within the description of the patent, which would double the speed attainable with the tubs. In proving profits, it is necessary to show a saving by the use of the infringing tool over the cost of operating any other tool which defendant was free to use. Potter, a longshoreman laborer, who had worked on defendant's piers, at first testified that the net slings were three times as fast as the herring tubs, but subsequently reduced his statement saying: "Three times is a good deal. That is almost too big an average, you know. But take it double,—double the time. That would be something like it." Evidently, this is mere guesswork, and the witness admits that he never took any time on the nets or the tubs.

In view of this record, it might be possible to make some vague guess, as many of the witnesses have, as to how much faster some one appliance would work than another, under favorable circumstances; but there seems to be absolutely no proof which would warrant the court in finding that by the use of the infringing nets defendant saved any specific number of hours out of the time it would have taken to do the work with one or other of the cargo-hoisting appliances available to defendant. The testimony falls far short of the reliable and tangible proof which is required to establish profits. The decree of the circuit court is affirmed, with costs.